FILED
CLERK, U.S. DISTRICT COURT
4/23/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>LILIT GAGIKOVNA BALTAIAN<br>aka "Lilit Gagikovna<br>　　　Oganesyan,"<br><br>　　　　Defendant. | CR   2:21-cr-00198-JAK<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 982: Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH FOUR

[18 U.S.C. §§ 1347, 2]

A.   INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Defendant LILIT GAGIKOVNA BALTAIAN, also known as "Lilit Gagikovna Oganesyan," was a resident of Porter Ranch, California.  Defendant BALTAIAN was a physician licensed to practice in California.  Defendant BALTAIAN owned and operated a clinic in Tujunga, California, under the corporate name "Lilit

Baltaian MD, Inc." In or around 2018, defendant BALTAIAN opened a second clinic under the same corporate name in Reseda, California.

2. Home Health Agency 1 ("HHA-1") was a home health agency located in Glendale, California. Co-Schemer 1 ("CS-1") was the owner and operator of HHA-1.

3. Home Health Agency 2 ("HHA-2") was a home health agency located in Panorama City, California. Co-schemer 2 ("CS-2") was the owner and operator of HHA-2.

4. Home Health Agency 3 ("HHA-3") was a home health agency located in Glendale, California. Co-schemer 3 ("CS-3") was the owner and operator of HHA-3.

5. Home Health Agency 4 ("HHA-4") was a home health agency located in Panorama City, California. Co-schemer 4 ("CS-4") was the owner and operator of HHA-4.

The Medicare Program

6. Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled. The U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") administered Medicare, which was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program" as defined by Title 42, United States Code, Section 1320a-7b(f).

7. The individuals who were enrolled in Medicare were referred to as "beneficiaries." Medicare beneficiaries were issued beneficiary identification cards that certified

eligibility for Medicare and identified each beneficiary by a unique health identification card number ("HIC number").

8. Home health agencies ("HHAs"), physicians, and other health care providers that provided medical services to beneficiaries that were to be reimbursed by Medicare were referred to as Medicare "providers."

9. To participate in Medicare, providers were required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations, including the anti-kickback statute (42 U.S.C. § 1320a-7b(b)), which proscribed the offering, payment, solicitation, or receipt of any remuneration in exchange for a patient referral or referral of other business for which payment may be made by any federal health care program. If Medicare approved the provider's application, Medicare assigned the provider a Medicare "provider number" which was used for submitting, processing, and paying claims.

10. With certain statutory exceptions, Medicare did not cover and would not reimburse "any expenses incurred for items or services . . . [that were] not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the function of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Additionally, Medicare would not reimburse any expenses incurred for items or services procured through the payment of illegal kickbacks or that had never been provided.

11. Home health care was supportive health care that was provided to patients in their homes. Home health care was prescribed by a treating physician to a patient if the patient

had developed an illness or injury that required skilled care, but not at the level provided by an acute facility such as a hospital or at a residential skilled nursing facility.  Home health services might include changing wound dressings, giving injections, or teaching a patient's family member to properly care for a patient recently discharged from the hospital.

12.   To qualify for the Medicare home health benefit, a beneficiary must: (1) have been confined to his or her home; (2) have been under the care of a physician; (3) have received services under a CMS Form 485 Home Health Certification and Plan of Care ("485") established and periodically reviewed by a physician; (4) have had a face-to-face encounter with a physician or approved provider within a specified period of time from the start of home health care; and (5) need skilled nursing care on an intermittent basis, physical therapy, speech-language pathology, or have a continuing need for occupational therapy.

13.   A patient was considered to be confined to his or her home ("homebound") if the patient met two criteria: (1) the patient was generally unable to leave home, such that leaving home required a considerable and taxing effort; and (2) the patient must either, (i) because of illness or injury, have needed the aid of supportive devices such as a cane, walker, wheelchair, or the use of special transportation, or required the assistance of another person in order to leave his or her residence, or (ii) had a condition such that leaving his or her home was medically contraindicated.

14.   Prior to the start of care, a physician, registered nurse, or qualified therapist must have completed an assessment

of the patient, using the Outcome and Assessment Information Set ("OASIS") created by CMS. The OASIS was a comprehensive assessment designed to collect information on a home health care recipient's clinical status, functional status, and service needs. The information gathered during the assessment was then used to create the 485 for that patient. A 485 had to indicate the type of services to be provided to the patient, both with respect to the professional who would provide them and the nature of the individual services, as well as the frequency of the services.

15. To be appropriately reimbursable by Medicare, in addition to being reasonable and necessary, skilled nursing services must have required specialized judgment, knowledge, or the skills of a registered nurse or licensed practical (vocational) nurse under the supervision of a registered nurse. The services must have been so inherently complex that the service could only be safely and effectively performed by, or under the supervision of, a professional. Examples include intravenous medications, intramuscular injections, insertion of a catheter or respiratory treatments.

16. To be appropriately reimbursable by Medicare, in addition to being reasonable and necessary, physical therapy, speech-language pathology, or occupational therapy must have been inherently complex and required a skilled therapist in order to safely and/or effectively perform the service. The services must have required the specialized skill, knowledge, and judgment of a therapist. Services involving activity for the general welfare of any patient, such as general exercises to

promote overall fitness or flexibility or activities to provide diversion or general motivation did not constitute skilled therapy.

### The Claims Process

17. HHAs that provided reasonable and necessary services to Medicare beneficiaries could submit claims for reimbursement to Medicare. In order for the HHA to initiate home health care services, a physician must have certified that the above Medicare requirements, among others, were met.

18. The services that an HHA provided to the patient were based upon the 485, which must have been reviewed and signed by the physician who established the 485, in consultation with the HHA's professional personnel, at least every 60 days. CMS permitted continuous 60-day episodes of home health care for beneficiaries who continued to be eligible for home health benefits.

19. A provider could submit a claim to Medicare through the mail or electronically. Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that they were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; that they would submit claims only on behalf of those Medicare recipients who had given their written authorization to do so; and that they would submit claims that were accurate, complete, and truthful. If the provider submitted by mail, the provider had to agree to the same conditions.

6

B.   **THE FRAUDULENT SCHEME**

20.   Beginning in or around January 2012, and continuing until at least in or around July 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant BALTAIAN, together with others known and unknown to the Grand Jury, aiding and abetting each other, knowingly, willfully, and with the intent to defraud, executed and willfully caused to be executed a scheme and artifice: (1) to defraud a health care benefit program, namely, Medicare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (2) to obtain money from Medicare by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C.   **MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD**

21.   The fraudulent scheme operated, in substance, as follows:

a.   Defendant BALTAIAN received Medicare beneficiary information from HHA-1, HHA-2, HHA-3, and HHA-4, including from CS-1, CS-2, CS-3, and CS-4 at each of those respective HHAs.

b.   Defendant BALTAIAN then referred those Medicare beneficiaries to those HHAs for purported home health care, and signed 485s for these beneficiaries that falsely indicated that the beneficiaries were qualified to receive home health care, regardless of the beneficiaries' actual conditions.

c.   In fact, as defendant BALTAIAN and her co-schemers at the HHAs then knew, many of these beneficiaries had

never been seen or evaluated by defendant BALTAIAN or by any qualified professional that worked for defendant BALTAIAN regarding their need for home health care, and many beneficiaries did not meet Medicare's eligibility requirements to receive home health care.

   d. In exchange for providing and/or signing the fraudulent referrals, 485s, and other fraudulent medical documentation to support their false claims to Medicare, defendant BALTAIAN also received cash from HHA-1, HHA-2, and HHA-4.

   e. As defendant BALTAIAN knew they would, CS-1, CS-2, CS-3, and CS-4 at HHA-1, HHA-2, HHA-3, and HHA-4, respectively, and others known and unknown to the Grand Jury, used defendant BALTAIAN's fraudulent referrals, 485, and other fraudulent medical documentation to support false claims to Medicare for home health services that were not medically necessary for and/or never provided to those beneficiaries.

   f. In addition to receiving a cash benefit related to these referrals, defendant BALTAIAN also used the information for these beneficiaries that she obtained from the HHAs to submit false and fraudulent claims to Medicare for which she could be reimbursed directly.  In particular, defendant BALTAIAN (1) submitted claims to Medicare for signing fraudulent 485s for some of these same beneficiaries, and (2) converted some of the beneficiaries into patients of her own clinic, and submitted false and fraudulent claims to Medicare for care, including patient visits and injections, allegedly provided to those

beneficiaries, knowing that the care was not needed and/or provided.

22. Between January 2012 and July 2018, HHA-1, HHA-2, HHA-3, and HHA-4 billed Medicare for providing home health care to beneficiaries for whom defendant BALTAIAN was listed as the attending or referring physician, and were paid a total of approximately $6,029,674 on those claims.

D.  EXECUTIONS OF THE FRAUDULENT SCHEME

23. On or about the dates set forth below, within the Central District of California, and elsewhere, defendant BALTAIAN, together with others known and unknown to the Grand Jury, aiding and abetting each other, knowingly and willfully executed the fraudulent scheme described above in that defendant submitted and caused to be submitted to Medicare the false and fraudulent claims identified below and caused Medicare to make the following payments:

| COUNT | BENE-FICIARY | CLAIM | PROCEDURE | DATE CLAIM PAID | APPROX. AMT. PAID BY MEDICARE |
|---|---|---|---|---|---|
| ONE | M.D. | 5511161038-73430 | Physician Certif. for Home Health | 4/26/2016 | $46.71 |
| TWO | O.D. | 5511161038-73360 | Physician Certif. for Home Health | 4/26/2016 | $46.71 |
| THREE | H.S. | 5518173420-28580 | Office Visit/ Injection | 12/22/2017 | $88.33 |

9

| COUNT | BENE-FICIARY | CLAIM | PROCEDURE | DATE CLAIM PAID | APPROX. AMT. PAID BY MEDICARE |
|---|---|---|---|---|---|
| FOUR | L.M. | 5548182020-20613 | Office Visit/ Injection | 8/21/2018 | $113.70 |

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7), in the event of conviction of defendant LILIT GAGIKOVNA BALTAIAN, also known as "Lilit Gagikovna Oganesyan," of the offenses set forth in any of Counts One through Four of this Indictment.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished

in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

      /S/
Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

KRISTEN A. WILLIAMS
Assistant United States Attorney
Deputy Chief, Major Frauds Section

DANIEL KAHN
Acting Chief, Fraud Section
United States Department of Justice

ALLAN MEDINA
Deputy Chief, Fraud Section
United States Department of Justice

NIALL M. O'DONNELL
Assistant Chief, Fraud Section
United States Department of Justice

EMILY Z. CULBERTSON
Trial Attorney, Fraud Section
United States Department of Justice